```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
UNITED STATES OF AMERICA               :
                                       :
          -v-                          :      06 Cr. 600 (DLC)
                                       :
ALI AWAD, ABDI EMIL MOGE, ABDINUR AHMED:         Opinion
DAHIR, and ABDULAHI HUSSEIN,           :
                                       :
          Defendants.                  :
-------------------------------------- X
```

Appearances:

For United States of America:

Daniel Lawrence Stein
Guruanjan Sahni
Seetha Ramachandaran
Assistant United States Attorneys
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

For Abdi Emil Moge:

Sidney L. Moore Jr.
34 Peachtree Street, Suite 2560
Atlanta, Georgia 30303

DENISE COTE, District Judge:

One of the defendants in this criminal case sought to admit into evidence at trial as a public record a 1992 report and recommendation from the Department of Health and Human Services ("HHS") that cathinone should be added to Schedule I of the Controlled Substances Act ("Report"). The Government's objection to the receipt of the Report in evidence at trial was sustained. This Opinion explains the reasons for that ruling.

BACKGROUND

Forty-four defendants have been indicted in this case for conspiring to import and distribute cathinone, an ingredient of the khat plant, in violation of Title 21, United States Code, Sections 952(a), 960(b)(3), 841(a)(1) and 841(b)(1)(C). Four leaders or otherwise significant members of the alleged conspiracies were tried on these and related charges beginning on June 4, 2007. Defendant Abdi Emil Moge ("Moge") was one of the four and he moved during the trial to have the Report admitted as a public record pursuant to Rule 803(8), Fed. R. Evid. ("Rule 803(8)").

One of the principal defenses tendered at the June 4 trial was that the defendants did not know that the khat which they imported into and distributed in the United States contained cathinone or any other controlled substance.[1] Khat is not a controlled substance, and therefore its sale, without more, is not a violation of the Controlled Substances Act.

The defendants offered evidence from a botanist that cathinone is an unstable molecule which rapidly degrades into cathine.[2] The expert testified that from his review of the

---

[1] The jury was charged that it had to find that the object of the conspiracy was to distribute or import cathinone or some substance controlled by American drug abuse law.

[2] The parties dispute whether cathine is a Schedule IV controlled substance, specifically whether the DEA failed to take the steps which would have preserved its listing as a controlled substance. The Government agreed that this legal issue did not need to be

2

literature,[3] it appeared that cathinone deteriorates into cathine between forty-eight and seventy-two hours from the time of harvest, but that this time period could vary depending on how the khat is handled after harvest.  Defendant Moge also offered the Report in order principally to put before the jury the HHS discussion of the rate at which cathinone converts into cathine.

The Report explains that cathinone was added to Schedule I of the international Convention on Psychotropic Substances ("Convention") in 1986.  The United States is a signatory to the Convention and therefore the Drug Enforcement Administration ("DEA") initiated procedures to comply with the Convention.  Those procedures required HHS to evaluate cathinone and make a recommendation regarding scheduling.  On November 5, 1992, HHS recommended that cathinone be listed as a Schedule I controlled substance under the Controlled Substances Act based on the Report prepared by the FDA's Pilot Drug Review Staff.  Based on the

---

resolved since it would proceed to trial on the theory that the only controlled substance that the conspirators agreed to import and distribute was cathinone.  As a consequence, the jury was instructed that cathinone is a controlled substance, but that cathine is not.

[3] Although the defense expert had no basis to give this testimony other than his review of the literature, the Government did not object to this portion of his testimony.  This no doubt reflected its understanding that the defendants were entitled to put before the jury in some manner the undisputed fact that cathinone degrades quickly into cathine, and its recognition that it would be very difficult for the defendants to obtain testimony from any of the scientists who had actually conducted research on the khat plant or to find a researcher who would be interested in conducting such testing.

3

Report's recommendation, cathinone became a Schedule I controlled substance in 1993.  58 Fed. Reg. 4316 (Jan. 14, 1993) (to be codified at 21 C.F.R. § 1308.11).

The Report is entitled "Basis for the Recommendation for Control of Cathinone into Schedule I of the Controlled Substances Act" and consists of eighteen pages with four and a half more pages of reference citations.  Much of the Report is dedicated to a review of scientific and medical research and information.  The research found cathinone to be the principle active component of khat, and the substance that is "responsible for most of the psychoactive properties of khat."  The research into its pharmacology and chemical structure revealed that it is similar to amphetamine and methamphetamine.  Most of the pharmacological information was derived from animal studies, where its effects were found to be similar to the effects of amphetamine.  There was only limited information of the effects of khat in human beings.  The Report also described in general terms the legal regimes for regulating khat in different countries and patterns of use and abuse of the plant in different countries and cultures.

The Report concludes with a page-long recommendation containing its principal findings, which relate to the "necessary criteria for placing a substance into Schedule I" of the Controlled Substance Act.  It found that cathinone's abuse potential is similar to those of amphetamine and methamphetamine

and that cathinone has not been accepted for medical use in the United States.  It concluded that cathinone has a high potential for abuse and that easy clandestine synthesis is feasible.

The passages which defendant Moge identified as of particular interest included the following three statements about the conversion of cathinone to cathine[4]:

> (-)-Cathinone is mainly present in young leaves, in which it may account for up to 70% of the phenylalkylamine fraction.  Cathinone is a biosynthetic precursor that accumulates in young leaves, while in adult leaves it undergoes enzymatic reduction to the less active cathine and norephedrine, which are then present at a ratio of approximately 4:1.  It has been <u>estimated</u> that 100 grams of fresh khat contain 36 mg cathinone, 120 mg cathine and 8 mg norephedrine. . . .
>
> [F]resh khat <u>may</u> contain a hundred times more cathinone than dried material, which in turn shows an increased content of cathines. . . .
>
> Khat leaves <u>have been reported</u> to lose their effect within <u>about</u> three days after harvesting.

(Emphasis supplied).  In contrast to much of the scientific information presented in the Report, including the information comparing cathinone to amphetamine, the Report identifies no sources for these statements and couches each statement in language expressing scientific uncertainty.

Defendant Moge also highlights the following passages about the effect of khat consumption on humans.

---

[4] Although not highlighted by defense counsel, it is likely that he would also have liked to present the following passage to the jury:  "Upon drying or within three days after harvesting of the khat plant, cathinone rapidly decomposes into cathine."

> Users get a feeling of well-being, mental alertness and
> excitement. After-effects are usually insomnia,
> numbness, and lack of concentration. Concern among
> various parts of the populace is that excessive use may
> create considerable problems of social, health and
> economic nature. . . .
>
> In general, few diseases or conditions among khat users
> occur with sufficient frequency to permit detailed
> analysis associated with khat use. Conditions most
> strongly associated with use by both sexes were
> histories of gastritis and insomnia, and the general
> body system groupings of gastrointestinal disorders.
> In males the strongest associations were with the
> histories of anorexia, constipation, insomnia,
> headaches, and respiratory difficulties. In females,
> strong positive associations between khat use and acute
> gastritis, jaundice, bronchitis and hepatic diseases
> were correlated.

As was true for the other excerpts discussing the racemization of cathinone, these passages have no citations to the research which supports them.

DISCUSSION

> Rule 803(8) sets forth an exception to the hearsay rule for:
>
> Records, reports, statements, or data compilations, in
> any form, of public offices or agencies, setting forth
> (A) the activities of the office or agency, or (B)
> <u>matters observed</u> pursuant to duty imposed by law as to
> which matters there was a duty to report, excluding,
> however, in criminal cases matters observed by police
> officers and other law enforcement personnel, or (C) in
> civil actions and proceedings and against the
> Government in criminal cases, <u>factual findings
> resulting from an investigation</u> made pursuant to
> authority granted by law, unless the sources of
> information or other circumstances indicate lack of
> trustworthiness.

Fed.R.Evid. 803(8) (emphasis supplied). The "[j]ustification for the exception [in Rule 803(8)] is the assumption that a public

official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Fed.R.Evid. 803(8) advisory committee's note (1972 Proposed Rules); see also Fed.R.Evid. 803(8) advisory committee's note (1974) (noting that Rule 803(8) was approved "without substantive change from the form in which it was submitted by the Court"). In addition to these justifications, courts have also explained that "Rule 803(8) is based upon the assumption that public officers will perform their duties, that they lack motive to falsify, and that public inspection to which many such records are subject will disclose inaccuracies." Bridgeway Corp. v. Citibank, 201 F.3d 134, 143 (2d Cir. 2000) (citation omitted). With respect to subsections (A) and (B), "further support is found in the reliability factors underlying records of regularly conducted activities generally." Fed.R.Evid. 803(8) advisory committee's note (1972 Proposed Rules).

Section 803(8), unlike the business records exception in Rule 806(6), does not require foundational testimony. United States v. Doyle, 130 F.3d 523, 546 (2d Cir. 1997). A document is presumptively admissible if it meets the requirements of one of the subsections. Bridgeway, 201 F.3d at 143. This presumption may be rebutted by showing that the sources of information or other circumstances indicate a lack of trustworthiness. See id. Where the basic affirmative requirements of Rule 803(8) have been satisfied, the burden to show a lack of trustworthiness shifts to

7

the party opposing admission.  Id. (discussing subsection C).  Even where a document satisfies the threshold requirements, "an entire report or portions thereof" may be excluded if they are untrustworthy.  Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 167 (1988); see also Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 264 (4th Cir. 2005).

Subsection B, which encompasses reports on "matters observed pursuant to duty imposed by law", includes reports prepared by government officers such as autopsy reports.  See United States v. Feliz, 467 F.3d 227, 237 (2d Cir. 2006).  It may also encompass "statements of non-governmental parties who act as agents for the government under duties imposed by law," but in such instances there should also be a "showing of procedures that assure the documents are reliable, of any standards applied to the recordation of the documents, or of monitoring by [a government agency] of their accuracy."  United States v. Doyle, 130 F.3d 523, 546-47 (2d Cir. 1997).  Thus, a legal request for filing documents, such as the filing of tax returns, would not alone qualify the records for admission without a showing of reliability.  See id. at 547.

Subsection C concerns evaluative or investigative reports.  "A public record based upon information supplied by outsiders should be viewed as investigative in nature and examined under clause (C)."  Robbins v. Whelan, 653 F.2d 47, 50 n.5 (1st Cir. 1981) (citation omitted).  Rule 803(8)(C) includes "factually

based conclusions or opinions." Beech, 488 U.S. at 162. "Trustworthiness," and not an arbitrary distinction between fact and opinion, is the "primary safeguard against the admission of unreliable evidence." Id. at 167; see Bridgeway, 201 F.3d at 143. The "reporting agency must have firsthand knowledge of the investigation by which it accumulates the published factual findings that Rule 803(8)(C) contemplates, since it is the quality of the investigation that determines the caliber of the results." Robbins, 653 F.2d at 52.

> Factors which may be of assistance in passing on the admissibility of evaluative reports include [and are not limited to]: (1) the timeliness of the investigation; (2) the special skill or experience of the official; (3) whether a hearing was held and the level at which conducted; and (4) possible motivation problems suggested by Palmer v. Hoffman, 318 U.S. 109 . . . (1943).

Fed.R.Evid. 803(8) advisory committee's note (1972 Proposed Rules) (additional citation omitted); see Bridgeway, 201 F.3d at 143; see also Palmer v. Hoffman, 318 U.S. 109, 114 (1943) (discussing document prepared for litigation).

Some courts have admitted scientific reports or evaluations by government agencies under Rule 803(8), often under Rule 803(C). For example, the First Circuit ruled that a Department of Transportation National Highway Safety Bureau report entitled "Performance Data for New 1971 Passenger Cars and Motorcycles" was admissible under Rule 803(8)(C) as evidence of the maximum stopping distances for the car at issue in a tort case. Robbins,

653 F.2d at 49, 52.  The agency had initiated the inquiry and specified in detail the standards to which the manufacturers were to adhere in conducting the tests which generated the data included in the report.  Id. at 52.  The agency had determined that the information was sufficiently reliable to present to the buying public as a tool for comparing car safety performances.  Id.

The Eighth Circuit recently affirmed a district court's admission of several Surgeon General reports on smoking as a public record.  Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 600-01 (8th Cir. 2005).  Apparently relying on subsection C, the Eighth Circuit held that the reports were properly admitted even though the data came from work conducted by independent and not government scientists.  Id. at 600.  The reports were prepared pursuant to a legal obligation to report information on smoking and health to Congress and were prepared by "a disinterested" agency.  Id. at 600-01.

The Honorable Denny Chin has also admitted a letter from the Food and Drug Administration to the defendant approving recall of a medical device, pursuant to subsection C as well as subsection B.  Figueroa v. Boston Scientific Corp., No. 00 Civ. 7911(DC), 2003 WL 21488012, at *3 (S.D.N.Y. 2003).  In Figueroa, a tort case, the report constituted evidence that the defendant was on notice that the medical device discussed in the letter presented a risk that it was not functioning as intended.  Id.

Although Rule 803(8) provides an exception to the hearsay rule for public records themselves, hearsay statements are not admissible merely because they appear within public records. United States v. Mackey, 117 F.3d 24, 28-29 (2d Cir. 1997); see City of New York v. Pullman, 662 F.2d 910, 915 (2d Cir. 1981); see also Fed.R.Evid 803 advisory committee's note (1972 Proposed Rules) ("In a hearsay situation, the declarant is, of course, a witness, and neither [Rule 803] nor Rule 804 dispenses with the requirement of firsthand knowledge. It may appear from his statement or be inferable from circumstances.") (citing Fed.R.Evid. 602). Other rules of evidence, including Rule 403, also apply to documents otherwise admissible under Rule 803(8). Beech, 488 U.S. at 167-68.

Moge has offered the Report under Rule 803(8)(B). The Report is clearly not admissible under that subsection. It is not a report of matters "observed" pursuant to a duty imposed by law. The authors of the Report did not observe the testing of the khat plant, or the other matters covered in the Report. Instead, they surveyed relevant literature and drew conclusions from that survey. Similarly, there is no basis to conclude that the scientists and researchers whose writings were evaluated by HHS were themselves making observations "pursuant to duty imposed by law as to which matters there was a duty to report." Since Moge relied exclusively on subsection B to support receipt of the Report, the analysis of its admissibility could stop here.

11

Nonetheless, this Opinion will also consider whether the Report is potentially admissible under subsection C.

The Report is properly classified as "factual findings resulting from an investigation made pursuant to authority granted by law." Fed. R. Evid. 803(8)(C).  HHS was required by law to provide this report to the DEA when the DEA requested its analysis, and DEA itself was required to place that request to HHS once the Convention placed cathinone on its own schedule of controlled substances.  The scientists within the FDA who compiled the Report and made their recommendations did so based on a set of factual findings that rested on their extensive examination of relevant scientific literature and other sources.

It appears that the Report, as a general matter, is highly trustworthy.  Much of the document is drawn from scientific research reported in peer reviewed journals.  A specialized agency prepared the Report, drawing upon the expertise it uses to perform similarly important tasks in its everyday work.  The Report was a final report, written with the understanding that another component of the executive branch as well as Congress would be relying on the document.  Moreover, because it recommended classification of cathinone on the schedule that carries the most serious criminal penalties, it is fair to infer that those drafting the Report acted with particular care.  Finally, it was not prepared for litigation, but rather was prepared in the normal course of the agency's business.

Nonetheless, because the Report embodies hearsay, it is appropriate to examine its constituent parts with care.  As already noted, much of the document relies directly upon scientific studies, referring to those studies in the text, and listing their full citations in an appendix.  Other parts of the Report, however, including several topics that are less critical to the scheduling decision, are not supported by any disclosed reference to source materials and are hedged with less precise language.  The passages in the Report to which Moge points fall into this latter category.

In considering the trustworthiness of the Report it is also appropriate to examine that issue in light of the purposes for which the document is offered.  A document can be entirely reliable when offered for one purpose, and yet less reliable or even unreliable when offered for another.  It is appropriate to examine the reliability of the document as evidence for the jury to use in resolving the issues which were in dispute at the trial.

Moge identified one purpose for which he wished to offer the Report.  He sought to show that three days after harvest, khat contains either no cathinone or only .17 grams of cathinone per 100 pounds.  From this he argued that it was implausible that the defendants were motivated in their efforts to import and

distribute khat by any desire to import or distribute cathinone.[5] To the extent that he was arguing that the defendants wanted khat because of the stimulant effects from the plant's ingredients other than cathinone, that argument is significantly undercut by the Report's conclusion that cathinone is responsible for most of the psychoactive properties of khat.  Moreover, Moge did not contend that he or anyone with whom he was working could detect the presence or absence of cathinone or any other ingredient in khat at any time during the importation or distribution of the khat.  Indeed, according to the evidence presented at trial, determining the presence of the cathinone molecule in khat requires laboratory equipment.  There was no evidence that visual, tactile, or olfactory examination of khat leaves could reveal the presence or absence of cathinone.  Thus, for the reasons stated above, the Report has limited utility for the

---

[5] While motive evidence is relevant, in particular to issues of intent and knowledge, the Government need not prove a defendant's motive in order to convict a defendant.  In this prosecution, the Government had to prove that the defendants conspired to import or distribute some substance controlled by American drug abuse law.  It did not have to prove that the defendants were familiar with the substance cathinone, or that its existence motivated their scheme.  Nor did it have to prove that the conspirators actually succeeded in importing or distributing any cathinone, since the crime of conspiracy only requires proof of an intent to import and distribute some substance controlled by American drug abuse law.  Even with respect to the substantive crime of distribution, an attempt to distribute some substance controlled by American drug abuse law while knowingly distributing khat would suffice.

point advanced by Moge.[6]

Moge may have had a second purpose in offering the Report, albeit one he did not acknowledge. Moge may have been seeking to cast doubt on the DEA chemists' findings that khat seized in this case contains a detectable amount of cathinone. The defendants had moved to preclude that testimony before trial based largely on a faulty understanding of the tests used by the DEA chemists to identify the presence or absence of cathinone in the seized khat. To the extent that this was Moge's purpose in offering the Report, then there are serious concerns about the admissibility

---

[6] On June 27, the jury found two of the defendants guilty of conspiring to import cathinone or some substance controlled by American drug abuse law, and three defendants guilty of conspiring to distribute such a substance. In answering a special verdict as to whether the Government had shown that the conspirators actually succeeded in importing khat which contained cathinone, the jury found that it had. It found that the Government had not succeeded, however, in showing that the conspiracy actually distributed khat containing cathinone.

The trial evidence relevant to this special verdict question included the following. DEA chemists testified that they had detected cathinone in each of the seized samples which they tested, but that there was no accepted scientific method for determining the concentration of the cathinone in the khat and they had not attempted to make such an evaluation. As a result, since their testing equipment is able to detect a miniscule quantity of cathinone, they could only assert that at least a miniscule quantity of cathinone was present. One of the Government's witnesses at trial, an accomplice of the defendants, testified that he had watched khat being stored for two days before being sold in Nairobi, Kenya so that it would not be as poisonous to chew. The defendants' expert testified that cathinone quickly degrades into cathine following harvest. Together, this evidence apparently convinced the jury that the Government had failed to present sufficient evidence that cathinone remained in the khat by the time it was distributed within the United States.

of the Report.

The focus of the Report was on cathinone's pharmacological impact on humans and its potential for abuse. The focus of the Report was not on the length of time cathinone is present in the plant, its rate of decay, or its detectability when subjected to scientific testing days, weeks or months after harvesting. For this reason, there are no citations in the portions of the Report to which Moge points, and therefore no basis to judge the reliability of the hearsay statements which are embedded in those passages. Similarly, these statements are couched in cautionary terms, using words and phrases like "may," "estimated," and "has been reported." Therefore, the Report is far less probative and reliable on these issues than on the issues for which it was commissioned and which more directly underlie its recommendation to place cathinone on Schedule I.

Balancing the considerations that are relevant to Rule 403, Fed. R. Evid. -- the risks of unfair prejudice, confusion, and adding unnecessarily to the length of the trial -- those considerations substantially outweighed the limited probative value of the Report. The unfair prejudice from admitting the Report could have affected either the Government or the defendants. As far as the Government's interests are concerned, portions of the Report could have been used explicitly or implicitly to request jury nullification by having the jury evaluate or at least consider the wisdom of criminalizing

cathinone.  On the other hand, portions of the Report could have unnecessarily inflamed the passions of the jury by drawing its attention to the seriousness of the effects of cathinone.  As far as jury confusion is concerned, there was a risk that admission of the Report would draw the jury's attention away from the disputed issues of fact that were critical to the trial, and unnecessarily prolong the trial by requiring the parties, in particular the Government, to spend time putting the various passages in the document into context.  Given these various concerns, the Report was properly excluded under Rule 403.

To the extent that Moge sought to offer not the entire Report, but only his highlighted passages, that limited offer was no more successful.  As already explained, those passages in the Report are far less reliable than the bulk of the Report.  By taking the passages out of context, their limited probative value would have been masked and the jury deprived of important information which would have helped it evaluate the reliability of the highlighted statements.  Moreover, by offering selections from a document authored by a federal agency, evidence which is not subject to cross examination, Moge sought to accomplish more than he can properly achieve.  He sought to tag the prosecutors with findings from one federal agency that would have appeared to cast doubt on the reliability of their chemists' work.  The DEA chemists who testified at trial detected cathinone in virtually all of the seized samples of khat that were submitted to them for

testing.  If this were a fair ground for impeaching the work of the chemists, then the Report could be used to cross-examine the chemists, and they would have an opportunity to explain any apparent discrepancy.  In fact, however, the Report does not pretend to offer any authoritative statement about the date on which, if ever, cathinone disappears from khat or how one would properly measure that.  Perhaps as a consequence, the defendants did not attempt to use the Report to impeach the chemists.

Finally, the Report was properly excluded because the defendants presented the jury with evidence that cathinone degrades quickly after harvesting through the testimony of their expert.[7]  As a consequence, the defendants had the factual foundation to present their motive argument to the jury, and they did so.

CONCLUSION

The Government report recommending the inclusion of cathinone as a Schedule I controlled substance was properly excluded under Rule 803(8) at the trial of defendants on charges that they conspired to import and distribute khat containing

---

[7] When the Court advised the parties at trial that the Report was inadmissible as a public record, it advised counsel that the ruling was premised on the assumption that the jury would have admissible evidence, either from an expert or by stipulation, that cathinone is an unstable compound and degrades rapidly. That evidence was admitted at trial through the testimony of a defense expert. The Government could have chosen, if it wished,

did so.

CONCLUSION

The Government report recommending the inclusion of cathinone as a Schedule I controlled substance was properly excluded under Rule 803(8) at the trial of defendants on charges that they conspired to import and distribute khat containing cathinone.

SO ORDERED:

Dated:   New York, New York
         July 3, 2007

                                    _____
                                          DENISE COTE
                                    United States District Judge

---

to impeach that testimony with an examination of the sources for that opinion. It chose not to do so.